UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2002

Argued November 4, 2002        Decided     June 6, 2003
Errata Filed: July 2, 2003)

Docket No. 02-7781

_____

THE BRONX HOUSEHOLD OF FAITH, ROBERT HALL and JACK ROBERTS,

Plaintiffs-Appellees,

v.

BOARD OF EDUCATION OF THE CITY OF NEW YORK and
COMMUNITY SCHOOL DISTRICT NO. 10,

Defendants-Appellants.

_____

Before:

CARDAMONE, MINER, and KATZMANN,
Circuit Judges.

_____

Defendants, New York City Board of Education and Community School District No. 10, appeal from a preliminary injunction entered July 3, 2002 in the United States District Court for the Southern District of New York (Preska, J.). The preliminary injunction, granted upon motion of plaintiffs the Bronx Household of Faith, Robert Hall and Jack Roberts, enjoined defendants from enforcing the New York City Board of Education's Standard Operating Procedure § 5.11 so as to deny plaintiffs' application to rent space in a public school operated by the Board of Education for morning meetings that include religious worship or the application of any similarly situated individual or entity.

Affirmed.

Judge Miner dissents in a separate opinion.

_____

_____

JANE L. GORDON, New York, New York (Edward F.X. Hart, Lisa Grumet, Michael A. Cardozo, Corporation Counsel of the City of New York, New York, of counsel), <u>for Defendants-Appellants</u>.

JORDAN W. LORENCE, Scottsdale, Arizona (Benjamin W. Bull, Alliance Defense Fund Law Center, Scottsdale, Arizona; Rena Lindevaldsen, Esanu, Katsky, Korins & Siger, LLP, New York, New York; Joseph P. Infranco, Migliore & Infranco, Commack, New York, of counsel), <u>for Plaintiffs-Appellees</u>.

_____

Jay Worona, New York State School Boards Association, Inc., Latham, New York (James R. Sandner, Carol Gerstl, United Federation of Teachers, New York, New York, of counsel), <u>filed a joint amicus curiae brief on behalf of the New York State School Boards Association, Inc. (NYSSBA), and The United Federation of Teachers (UFT)</u>.

Jennifer Levin, Washington, D.C. (Ralph F. Boyd, Jr., Assistant Attorney General, David K. Flynn, Eric W. Treene, Civil Rights Division, U.S. Department of Justice, Washington, D.C.; James B. Comey, U.S. Attorney, David J. Kennedy, Neil M. Corwin, Gideon A. Schor, Assistant U.S. Attorneys, Southern District of New York, New York, New York, of counsel), <u>filed a brief for the United States as Amicus Curiae</u>.

Anthony R. Picarello, Jr., Washington, D.C. (Roman P. Storzer, Derek L. Gaubatz, The Becket Fund for Religious Liberty, Washington, D.C., of counsel), <u>filed a brief for The Becket Fund for Religious Liberty as Amicus Curiae</u>.

_____

CARDAMONE, Circuit Judge:

This appeal concerns the proposed use of a public school building for Sunday worship services by an evangelical Christian church. Courts often struggle to reconcile the principle of equal access to government buildings with a competing principle of American public life, that is, the separation of church and state. In the case before us, the district court resolved this tension in favor of allowing religious speech on public property. Recent Supreme Court precedent requires that we affirm.

BACKGROUND

A. Prior Legal Proceedings

Plaintiff, the Bronx Household of Faith (church), is an evangelical Christian church founded in 1971 and located in the Bronx, New York. Plaintiffs Robert Hall and Jack Roberts are its co-pastors. This litigation represents plaintiffs' second attempt to compel defendants, the Board of Education of the City of New York and Community School District No. 10 (collectively defendants or appellants), to allow plaintiffs to rent space in public school M.S. 206B, Anne Cross Mersereau Middle School (Middle School 206B), for Sunday morning meetings that include, at least in part, activities that may be characterized fairly as religious worship.

Plaintiffs' first application to rent space in Middle School 206B was rejected by defendants in 1994, resulting in litigation between the present plaintiffs and defendants in the Southern District of New York. In that case, the district court granted

defendants' motion for summary judgment dismissing plaintiffs' complaint. Bronx Household of Faith v. Cmty. Sch. Dist. No. 10, No. 95 Civ. 5501, 1996 WL 700915 (S.D.N.Y. Dec. 5, 1996). We affirmed, and the Supreme Court denied certiorari. Bronx Household of Faith v. Cmty. Sch. Dist. No. 10, 127 F.3d 207 (2d Cir. 1997), cert. denied, 523 U.S. 1074 (1998) (Bronx Household I).

In 2001 plaintiffs again applied for use of space in Middle School 206B and, when their application was denied, brought the present action in the United States District Court for the Southern District of New York (Preska, J.). The plaintiffs' central point before the district court was that the Supreme Court's decision in Good News Club v. Milford Central School, 533 U.S. 98 (2001), effectively overruled our holding in Bronx Household I. Plaintiffs contend that, as a result, the Education Board's policy of excluding community groups from renting school premises for purposes of "religious services or religious instruction" -- while allowing most other types of community groups to hold meetings -- violates their First Amendment right to freedom of speech.

Agreeing that plaintiffs were substantially likely to prevail on the merits of their claim, Judge Preska granted their motion for a preliminary injunction. Bronx Household of Faith v. Bd. of Educ., 226 F. Supp. 2d 401 (S.D.N.Y. 2002) (Bronx Household II). The preliminary injunction enjoins defendants "from enforcing the New York City Board of Education's Standard

3

Operating Procedure § 5.11 so as to deny plaintiffs' application to rent space in a public school operated by the Board of Education for morning meetings that include religious worship or the application of any similarly-situated individual or entity." From the grant of this preliminary injunction, defendants appeal. The district court and we denied defendants' application for a stay pending appeal.

In reviewing the grant of this preliminary injunction, we revisit a dispute that is no stranger to this Court. Although we have reached the merits in this litigation previously, the issues now raised return to us in a different procedural posture, requiring employment of a different standard of review than that used in Bronx Household I. The instant litigation also arises against a backdrop of additional Supreme Court precedent. In Good News Club, a recent school and religion case with facts that parallel in many respects those here, the Supreme Court held that "quintessentially religious" activities could be "characterized properly as the teaching of morals and character development from a particular viewpoint." 533 U.S. at 111. The Supreme Court also reiterated in its Good News Club decision that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Id. at 109-10. The defendants in this case, like the defendant in Good News Club, have opened the relevant limited public forum to the teaching of morals and character development. Accordingly, we affirm and

4

hold that the district court did not abuse its discretion when it granted plaintiffs' motion for a preliminary injunction.

## B. Facts

On July 6, 2001 plaintiffs wrote to the School District renewing their prior request to rent Middle School 206B, citing the Supreme Court's Good News Club decision as the basis for the renewed request. Plaintiffs sought to meet at the school from 10:00 a.m. to 2:00 p.m. each Sunday morning, beginning on September 30, 2001, to engage in "singing," "the teaching of adults and children . . . from the viewpoint of the Bible," and "social interaction among the members of [the] church, in order to promote their welfare and the welfare of the community."

Frank Pagliuca, Director of School Facilities and Planning for the School District, responded in writing to the church's request, stating that it appeared to intend to use the school for the same purpose -- i.e., "weekly worship service" -- that the School District had denied in 1994. Mr. Pagliuca's letter reminded plaintiffs that the District's prior denial "was upheld by the Federal Appeals Court," and advised them that if plaintiffs intended different usage than before, they should submit additional information. Plaintiffs state that on August 16, 2001 their counsel was informed by Deborah King, Esq., an attorney for the Board of Education, that defendants were denying the church's request for rental space "because the meetings would violate the defendants' policy prohibiting religious services or instruction in the school buildings."

5

Although in this second request to rent space in Middle School 206B, the church did not describe its proposed use as "religious service" or "religious instruction" -- likening it instead to other uses permitted under School Board policy -- the School Board correctly perceived that plaintiffs were, in substance, renewing their prior request to conduct activities that included a weekly worship service. Plaintiffs have since offered a fuller description of the activities in which they seek to engage:

> The Sunday morning meetings service consists of the singing of Christian hymns and songs, prayer, fellowship with other church members and Biblical preaching and teaching, communion, sharing of testimonies and social fellowship among the church members.
>
> In our church service, we seek to give honor and praise to our Lord and Savior Jesus Christ in everything that we do. To that end we sing songs and hymns of praise to our Lord. We read the Bible and the pastors teach from it because it tells us about God, what He wants us to do and how we should live our lives. . . . In keeping with ancient tradition, we have a light fellowship meal after the service, which consists basically of coffee, juice and bagels. This gives us opportunity to meet new people, talk to one another, share one another's joys and sorrows so as to be a mutual help and comfort to each other.
>
> . . .
>
> The Sunday morning meeting is the indispensable integration point for our church. It provides the theological framework to engage in activities that benefit the welfare of the community. Those who attend the Sunday morning meetings are taught to love their neighbors as themselves, to defend the weak and disenfranchised, and

6

> to help the poor regardless of their particular beliefs. It is a venue where people can come to talk about their particular problems and needs. Over the years we have helped people with basic needs such as food, clothing, and rent. We have also provided, by means of counseling, friendship and encouragement, help for people to get out of the multi-generational welfare cycle, to lead productive lives, to leave a life of crime and/or drugs to become responsible citizens, and to counsel people whose personal finances are out of control.
>
> In one recent case we helped an individual who was about to get evicted. . . . It is through the Sunday meeting where we directly or indirectly learn of these situations and where we can converse with the individuals involved in order to monitor the progress of the issue to be resolved.
>
> In years past, the church meeting was a very important place for Cambodian Refugees to come in order for us to get to know them so that we could help them with food, clothing and to help them get acclimated to American society. Most of them were Buddhists.

The Sunday morning meetings of the church are open to all members of the public. The church currently conducts its Sunday meetings in a large house or outdoors under a tent or canopy. The church also owns a vacant lot and asserts that it eventually intends to construct its own building.

The School District's denial of the church's request to rent school space -- in 1994 and again in 2001 -- was based on the Education Board's Standard Operating Procedures (SOP) Manual that sets forth a hierarchy of permitted uses of school facilities. According to the SOP Manual, the primary use of school premises must be for programs and activities of the Board of Education.

7

After the Board's programs and activities, school premises may be used for a variety of community activities, including "social, civic and recreational meetings and entertainment, and other uses pertaining to the welfare of the community," as long as these uses are "non-exclusive and open to the general public."

Section 5.11 of the SOP Manual -- enumerated as section 5.9 at the time of Bronx Household I -- prohibits any "outside organization or group" from conducting "religious services or religious instruction on school premises after school." The same section permits the use of school premises "for the purpose of discussing religious material or material which contains a religious viewpoint or for distributing such material."

The School District has over the years permitted a variety of organizations to use school premises for meetings and activities after school hours and on weekends. Examples of organizations that received such permission during the 2000-2001 school year include Girl Scouts; the Mosholu Community Center, which organizes sports and other recreational activities; University Heights, which sponsored sports events, holiday shows and activities relating to Black History Month; and Lehman College, which held classes in teaching English as a second language. At the same time, the School District has never granted an application seeking to use school facilities for religious services.

We pass now to a discussion of the rules governing the issuance of a preliminary injunction in general, and then apply those rules to this case.

DISCUSSION

I   Standard of Review

A district court's grant of a preliminary injunction is reviewed for an abuse of discretion. Such an abuse occurs when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts. See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). In cases raising First Amendment issues, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284-286 (1964)).

To obtain a preliminary injunction a party must demonstrate: (1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships

9

tipping decidedly in its favor.  See Forest City Daly Hous., Inc. v. Town of North Hempstead, 175 F.3d 144, 149 (2d Cir. 1999). Where the requested preliminary injunction would stay government action taken in the public interest pursuant to a statutory or regulatory scheme -- as it does here -- the less rigorous burden of proof standard envisioned by the phrase "fair ground for litigation" does not apply, and instead the party seeking injunctive relief must satisfy the more rigorous prong of "likelihood of success."  This higher standard of proof requires judicial deference to those regulations developed through reasoned democratic processes.  See id.

Moreover, an even higher standard of proof comes into play when the injunction sought will alter rather than maintain the status quo.  In such case, the movant must show a "clear" or "substantial" likelihood of success.  See Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233 (2d Cir. 1999) (per curiam).  Because the plaintiffs here sought an injunction that commands a positive act that alters the status quo, the district court correctly required that plaintiffs demonstrate a "clear" or "substantial" likelihood of success on the merits.

II  Irreparable Harm

In determining whether there was an abuse of discretion in the grant of injunctive relief, we first address the issue of irreparable harm.  In finding irreparable harm, the district court observed that the plaintiffs' claims implicate First Amendment speech rights that are the bedrock of our liberties,

10

and concluded that the church will suffer serious damage were an injunction not to issue. Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Elrod v. Burns, 427 U.S. 347, 373 (1976), we have not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights, see Amandola v. Town of Babylon, 251 F.3d 339, 343 (2d Cir. 2001) (per curiam).

On the one hand, we have said that since violations of First Amendment rights are presumed to be irreparable, the allegation of a First Amendment violation satisfies the irreparable injury requirement. Tunick v. Safir, 209 F.3d 67, 70 (2d Cir. 2000). On the other hand, we have suggested that, even when a complaint alleges First Amendment injuries, irreparable harm must still be shown -- rather than simply presumed -- by establishing an actual chilling effect. See Latino Officers Ass'n v. Safir, 170 F.3d 167, 171 (2d Cir. 1999).

Whatever tension may be said to exist in our case law regarding whether irreparable harm may be presumed with respect to complaints alleging First Amendment violations, we think is more apparent than real. Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed. For example, in Tunick an artist was denied a city permit to conduct a photographic shoot of nude models on a residential street. 209 F.3d at 69. In Bery v. City of New York, 97 F.3d 689 (2d Cir. 1996), groups of visual

11

artists opposed enforcement of a city regulation prohibiting them from exhibiting or selling their work in public places without a general vendor's license; under the regulation, only a limited number of the licenses could be in effect at any time. Id. at 691-92. In both cases the challenged government action directly limited speech and irreparable harm was presumed. See Tunick, 209 F.3d at 70; Bery, 97 F.3d at 693-94.

In contrast, in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights. The Supreme Court instructs us on this issue in Laird v. Tatum, 408 U.S. 1 (1972), that to establish a cognizable claim founded on the chilling of First Amendment rights, a party must articulate a "specific present objective harm or a threat of specific future harm." Id. at 14.

Thus, in Latino Officers Ass'n, plaintiffs challenged a police department's requirements that all officers notify the department of their intention to speak before a governmental agency or a private organization about department policy, and that they provide an after-the-fact summary of their comments. 170 F.3d at 169, 171. We found the theoretical possibility of a chilling effect on officers' speech too conjectural and insufficient to establish irreparable harm. Id. at 171. In Charette v. Town of Oyster Bay, 159 F.3d 749 (2d Cir. 1998), we

12

ruled the record insufficient to decide a topless bar operator's motion to enjoin enforcement of a zoning regulation that resulted in the bar's closing. The record contained no evidence indicating how soon after the issuance of the injunction, if at all, the bar could be reopened. Id. at 750-51, 756-57; see also Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv., 766 F.2d 715, 722 (2d Cir. 1985) (reversing a preliminary injunction enjoining employee's discharge pending arbitration because discharge did not chill First Amendment rights of members of union sufficiently to cause irreparable harm).

Here, the alleged deprivation of plaintiffs' First Amendment rights results directly from a policy of the defendant Board of Education that prohibits "religious services or religious instruction" in school facilities. Since it is this policy that led to a denial of the church's request to rent space in Middle School 206B and directly limits plaintiffs' speech, irreparable harm may be presumed. Because the plaintiffs' allegations entitle them to a presumption of irreparable harm, the district court's finding that the plaintiffs have fulfilled this requirement for the issuance of a preliminary injunction cannot be said to be an abuse of discretion.

III  Likelihood of Success on the Merits

Given that plaintiffs have demonstrated irreparable harm, we now reach the more difficult issue of whether the district court properly found that plaintiffs had shown a likelihood of success on the merits. As noted earlier, because they seek an injunction

13

that alters rather than preserves the status quo plaintiffs must satisfy a more rigorous standard of proof and demonstrate a clear or substantial likelihood of such success. Rodriguez, 175 F.3d at 233.

In determining whether defendants' denial of the plaintiffs' application to rent the school violates plaintiffs' First Amendment rights, we tread familiar ground. Faced with the same parties and identical facts, we reached the merits of this issue in Bronx Household I, upholding the district court's summary judgment ruling in favor of the defendants Board of Education and School District. Plaintiffs now insist that the Supreme Court's decision in Good News Club, in effect, overruled our holding in Bronx Household I. Judge Preska was persuaded to this view and hence ruled plaintiffs had demonstrated a substantial likelihood of success on the merits of the litigation. In order to ascertain whether this holding was an abuse of discretion, we examine our earlier decision in Bronx Household I and the Supreme Court's opinion in Good News Club.

### A. Bronx Household I

In Bronx Household I, we observed that the right to exercise free speech on government property depends on the kind of forum where the speech occurs, noting that the Supreme Court has identified three kinds: the traditional public forum, the designated public forum or "limited public forum," and the nonpublic forum. 127 F.3d at 211 (citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985)).

14

Although the church argued that Middle School 206B is an open public forum where the exercise of First Amendment rights cannot be excluded absent a compelling state interest, see 127 F.3d at 212, we were not persuaded that the school was "a place that has been devoted to general, unrestricted public assembly by long tradition or by policy or practice," id. at 213. Instead, we reasoned that the Board of Education, by restricting access to certain speakers and subjects, had created a limited public forum. Id. Within such a limited forum, the government may restrict access based on speaker identity and subject matter, but only if "the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Id. at 211-12 (quoting Cornelius, 473 U.S. at 806).

Having decided that the school was a limited public forum, we next addressed the question of whether the Education Board's rule prohibiting religious services and instruction is reasonable and viewpoint neutral. We held it reasonable for state legislators and school authorities to avoid identifying a public school with a particular church, when considering the effect of such identification on the minds of school children. Id. at 214. We also deemed the regulation viewpoint neutral, since it "specifically permits any and all speech from a religious viewpoint." Id. We recognized that religious worship services were barred, but believed a permissible distinction could be drawn between religious worship and other forms of speech from a religious viewpoint. Id. at 215. For those reasons and because

15

Middle School 206B was a limited public forum, we affirmed the summary judgment ruling in favor of the defendants.

## B. Good News Club

Subsequent to our decision in Bronx Household I, the Supreme Court decided Good News Club v. Milford Central School. At issue in Good News Club was defendant Milford Central School's community use policy that prohibited the use of school premises "by any individual or organization for religious purposes." 533 U.S. at 103. Because of this policy the school refused to allow plaintiff Good News Club, a private Christian organization for children between the ages of six and 12, to use school premises for activities that included praying, singing, reading, and learning the Bible. The school denied plaintiff's request to use its facilities because it thought "the kinds of activities proposed to be engaged in by the Good News Club were not a discussion of secular subjects such as child rearing, development of character and development of morals from a religious perspective, but were in fact the equivalent of religious instruction itself." Id. at 103-04.

The Good News Club sued challenging the school's policy on First Amendment grounds. The district court granted the school's motion for summary judgment and we affirmed, reasoning that the exclusion of the Club's "quintessentially religious" activities was constitutional content discrimination, not unconstitutional viewpoint discrimination. Good News Club v. Milford Cent. Sch., 202 F.3d 502, 510-11 (2d Cir. 2000). The Supreme Court granted

16

certiorari to resolve the conflict among the circuits "on the question whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech." Good News Club, 533 U.S. at 105. In the context of stating its intention to resolve that conflict, the Court mentioned our opinion in Bronx Household I and noted that it was on the same side of the split as Campbell v. St. Tammany's School Board, 206 F.3d 482 (5th Cir. 2000), a decision relying in part on our opinion in Bronx Household I, and one which the Supreme Court subsequently vacated and remanded in light of Good News Club, see Campbell v. St. Tammany's Sch. Bd., 533 U.S. 913 (2001). See Good News Club, 533 U.S. at 105-06.

In reversing the judgment of this Court, a divided Supreme Court found that by excluding the meetings of the Good News Club while allowing other types of instruction on moral and ethical issues the school maintained an exclusionary policy that "constitutes viewpoint discrimination." Id. at 107. The majority characterized the Club's proposed activities as teaching morals and character from a religious perspective. It did not think something that is "'quintessentially religious' or 'decidedly religious in nature' cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint." Id. at 111. Because the school allowed teachings about morals and character from a variety of other, secular perspectives, the Court continued, the school could not legally exclude the Club's meetings solely because of the

17

religious viewpoint it advocated. Id. at 111-12. The Court concluded by stating, "What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons." Id. at 111.

Significantly, the majority found no meaningful distinction between the case before it and Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384 (1993). Good News Club, 533 U.S. at 111-12. In Lamb's Chapel, the Supreme Court held that a school could not prohibit an outside group's demonstration of a film about family values simply because the film addressed the issue from a religious perspective, where the school admittedly would have allowed demonstration of a film addressing family values from a secular perspective. 508 U.S. at 393-94. The Good News Club majority reasoned that the Club -- like the Lamb's Chapel plaintiffs -- was seeking "to address a subject otherwise permitted [in the school], the teaching of morals and character, from a religious standpoint." The fact that the Good News Club proposed to conduct the teaching through "storytelling and prayer" rather than through film, as in Lamb's Chapel, was an "inconsequential" distinction. 533 U.S. at 109-12.

The dissenting members of the Supreme Court -- Justices Stevens, Souter, and Ginsburg -- perceived the speech at issue in Good News Club to be sufficiently different from that in Lamb's

18

*Chapel* to require the opposite result. Justice Stevens drew a distinction between three types of speech for religious purposes: (1) "religious speech that is simply speech about a particular topic from a religious point of view," such as the film at issue in *Lamb's Chapel*, (2) "religious speech that amounts to worship, or its equivalent," and (3) an "intermediate category that is aimed principally at proselytizing or inculcating belief in a particular religious faith." The Good News Club's meetings, in his estimation, fell into the third or proselytizing category. 533 U.S. at 130, 133 (Stevens, J., dissenting).

Justice Souter was of the opinion that "Good News intends to use the public school premises not for the mere discussion of a subject from a particular, Christian point of view, but for an evangelical service of worship calling children to commit themselves in an act of Christian conversion." *Id.* at 138 (Souter, J., dissenting). He emphasized that the Club's intended activities included elements of worship that made the case as different from *Lamb's Chapel* "as night from day." *Id.* at 137. Justice Souter further observed that the Club's meetings opened and closed with prayer, and that at the heart of each meeting was "the challenge," when the already "saved" children were invited to ask God for strength; and "the invitation," when the teacher would "invite" the "unsaved" children to "receive" Jesus as their "Savior from sin." *Id.* at 137-38. This dissenting justice criticized the majority's characterization of the Club's

19

activities as "teaching of morals and character, from a religious standpoint" as ignoring reality. Id. at 138-39.

The Supreme Court majority was not persuaded by the distinction drawn by the dissenters between speech from a religious perspective on the one hand and worship or proselytizing on the other. It did agree with Justice Souter's description of the Club's activities, which we just related, but concluded that those activities "do not constitute mere religious worship, divorced from any teaching of moral values." 533 U.S. at 112 n.4. The majority saw "no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys." Notwithstanding Justice Souter's forcefully expressed challenge, it explicitly rejected his characterization of the Club's activities as an "evangelical service of worship," saying that "[r]egardless of the label Justice Souter wishes to use, what matters is the substance of the Club's activities, which we conclude are materially indistinguishable from the activities in Lamb's Chapel and Rosenberger[ v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 832 (1995) (holding that a university's refusal to pay a third-party contractor for the printing costs of a student publication, based on the publication's religious editorials, was viewpoint discrimination)]." Id.

20

## IV  Resolution of Instant Appeal

### A.  Free Speech

Having laid out for purposes of comparison our holding in Bronx Household I and the Supreme Court's Good News Club opinion, we turn to an analysis of Bronx Household II, the appeal presently before us. We start with the holding of the trial court. In granting plaintiffs' motion for a preliminary injunction it relied on the Supreme Court's holding in Good News Club, believing that the activities proposed by the plaintiff church are similar to those in Good News Club. The trial court also thought that, after Good News Club, religious worship could not be treated as an inherently distinct type of activity, and was instead comparable to other activities involving ritual and ceremony, such as Boy and Girl Scout meetings. Additionally, it viewed the distinction between worship and other types of religious speech as one that cannot meaningfully be drawn by the courts.

Based upon our reading of the Supreme Court's decision in Good News Club, we do not think the district court abused its discretion in determining that the plaintiffs were substantially likely to establish that defendants violated their First Amendment free speech rights. Central to our conclusion is a candid acknowledgment of the factual parallels between the activities described in Good News Club and the activities at issue in the present litigation.

21

Although the majority in Good News Club characterized the Club's activity as "the teaching of morals and character development from a particular viewpoint," 533 U.S. at 111, this characterization cannot be divorced from Justice Souter's detailed description of the Club's activities that the majority adopted as accurate. Id. at 112 n.4. In Justice Souter's view, the Club's meetings did not consist solely of teaching, but also included elements consistent with "an evangelical service of worship." Id. at 138 (Souter, J., dissenting). The majority did not say that the meetings were somehow distinct from worship services, but simply observed that they were not "mere religious worship, divorced from any teaching of moral values." Id. at 112 n.4.

We find no principled basis upon which to distinguish the activities set out by the Supreme Court in Good News Club from the activities that the Bronx Household of Faith has proposed for its Sunday meetings at Middle School 206B. Like the Good News Club meetings, the Sunday morning meetings of the church combine preaching and teaching with such "quintessentially religious" elements as prayer, the singing of Christian songs, and communion. The church's Sunday morning meetings also encompass secular elements, for instance, a fellowship meal during which church members may talk about their problems and needs. On these facts, it cannot be said that the meetings of the Bronx Household of Faith constitute only religious worship, separate and apart from any teaching of moral values. 533 U.S. at 112 n.4.

Because the Board of Education has authorized other groups, like scout groups, to undertake the teaching of morals and character development on school premises, there is a substantial likelihood that plaintiffs would be able to demonstrate that the Board cannot exclude, under Supreme Court precedent, the church from school premises on the ground that the church approaches the same subject from a religious viewpoint. Additionally, the defendants' school building use policy permits social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community, so long as these uses are non-exclusive and open to the public. Therefore, there is a substantial likelihood that plaintiffs would be able to demonstrate that the defendants cannot bar the church's proposed activities without engaging in unconstitutional viewpoint discrimination.

We hold the district court did not commit an error of law or fact and therefore did not abuse its discretion by determining that plaintiffs were substantially likely to establish that defendants violated their First Amendment free speech rights. Our ruling is confined to the district court's finding that the activities plaintiffs have proposed for their Sunday meetings are not simply religious worship, divorced from any teaching of moral values or other activities permitted in the forum.

We decline to review the trial court's further determinations that, after Good News Club, religious worship cannot be treated as an inherently distinct type of activity, and

23

that the distinction between worship and other types of religious speech cannot meaningfully be drawn by the courts. We recognize that these conclusions are in obvious tension with our previous holding that a permissible distinction may be drawn between religious worship and other forms of speech from a religious viewpoint, Bronx Household I, 127 F.3d at 215, a proposition that was seriously undermined but not explicitly rejected in Good News Club. It is unnecessary for us to reach these issues in order to affirm the trial court's grant of a preliminary injunction in this case.

We pause, however, to note some unresolved issues that arise from the recent Supreme Court precedent that, as an appellate court, we are bound to follow. Would we be able to identify a form of religious worship that is divorced from the teaching of moral values? Should we continue to evaluate activities that include religious worship on a case-by-case basis, or should worship no longer be treated as a distinct category of speech? How does the distinction drawn in our earlier precedent between worship and other forms of speech from a religious viewpoint relate to the dichotomy suggested in Good News Club between "mere" worship on the one hand and worship that is not divorced from the teaching of moral values on the other?

Further, how would the state, without imposing its own views on religion, define which values are morally acceptable and which are not? And, if such a choice is impossible to make, would the state be required to permit the use of public school property by

24

religious sects that preach ideas commonly viewed as hateful? When several religious groups seek to use the same property at the same time, would not the state have to choose between them? What criteria would govern that choice? In all of this process, is there not a danger of excessive entanglement by the state in religion?

How the Supreme Court answers these difficult questions will no doubt have profound implications for relations between church and state. The American experiment has flourished largely free of the religious strife that has stricken other societies because church and state have respected each other's autonomy. Religion and government thrive because each, conscious of the corrosive perils of intrusive entanglements, exercises restraint in making claims on the other. The beneficiaries are a diverse populace that enjoys religious liberty in a nation that honors the sanctity of that freedom.

### B. Establishment Clause

We must resolve one final issue, that is, whether it is substantially likely that defendants will not succeed in demonstrating that their denial of plaintiffs' application is necessary to avoid a violation of the Establishment Clause.

The First Amendment to the United States Constitution, applicable to the states under the Fourteenth Amendment, prohibits the enactment of any "law respecting an establishment of religion." U.S. Const. amend I. Defendants maintain that, even if their actions infringe on plaintiffs' First Amendment

25

rights, the infringement is justified because it is necessary to avoid an appearance of state endorsement of religion and excessive entanglement between state and religion, in violation of the Establishment Clause.

In Good News Club, the majority acknowledged that a state's interest in avoiding an Establishment Clause violation "may be characterized as compelling, and therefore may justify content-based discrimination." 533 U.S. at 112. The Court then noted that, although its precedent did not yet establish whether that interest may also justify viewpoint-based discrimination, it did not need to resolve the issue because the school did not have a valid Establishment Clause interest. Id. at 113. In so ruling, the Supreme Court emphasized that the Good News Club's meetings were held after school hours, were not sponsored by the school, and were open to all students who obtained parental consent. It also noted that the school had made its forum equally available to other organizations. Id.

In addition, the Supreme Court rejected the argument that the young age of the children attending the elementary school impermissibly increased the danger of misperception of endorsement, stating that the Court had "never extended [its] Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present." Id. at 115. The Court emphasized that "even if [it] were to inquire into the minds of schoolchildren in [that] case, [it

26

could not] say the danger that children would misperceive the endorsement of religion [was] any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum." Id. at 118.

Relying on the Supreme Court's Good News Club rationale, the district court here concluded that there was a substantial likelihood that the church would be able to demonstrate that the School Board does not have a valid Establishment Clause interest because the proposed meetings: (1) occur on Sunday mornings, during nonschool hours; (2) are not endorsed by the School District; (3) are not attended by any school employee; (4) are open to all members of the public; (5) and there is no evidence that any school children would be on the school premises on Sunday mornings or would attend the meetings. To this list the district court might have added that the church apparently intended to pay rent for the use of the space. The district court believed that by allowing the meetings defendants were more likely to demonstrate neutrality toward religion, and would therefore probably not violate the Establishment Clause.

In light of the Supreme Court's refusal to find a valid Establishment Clause interest in Good News Club, and the strong factual similarities between this case and Good News Club, the district court's ruling is adequately supported at this stage of the litigation. The dissent's conclusion to the contrary, in our estimation, misapplies the necessarily deferential standard of review. We hasten to add, however, that this issue is factual

27

and its resolution in favor of plaintiffs now does not foreclose the possibility that defendants may, with further development of the record, ultimately prevail on it.[1]

### C. Res Judicata and Collateral Estoppel

As an endnote in our analysis, we hold the district court did not abuse its discretion in concluding that plaintiffs' claims were not barred by the principles of res judicata and collateral estoppel. Although defendants contend that plaintiffs' claims are barred by these doctrines they concede that a change in a controlling legal principle precludes their application. The defendants' argument that no such change has occurred is answered by our discussion.

### CONCLUSION

In sum, in the district court's grant of plaintiffs' motion for a preliminary injunction we find no errors of law or clearly erroneous findings of fact that could be said to constitute an abuse of discretion. The trial court properly found that the plaintiffs' claims are entitled to a presumption of irreparable harm and that, in light of the Supreme Court's opinion in Good News Club, plaintiffs are substantially likely to prevail on the merits.

The grant of a preliminary injunction is accordingly affirmed.

---

[1] For this very reason, the opening sentence of the dissent severely mischaracterizes the impact of our holding.

28